**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **Bright Data Ltd.,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**Oxylabs, UAB,**<br><br>    **Defendant.** | **Civil Action No.**<br>**2:23-cv-00171-JRG-RSP**<br><br><br>**JURY TRIAL DEMANDED** |

**OXYLABS' ANSWER TO BRIGHT DATA'S**
**COUNTERCLAIM AND OXYLABS' COUNTERCLAIMS**

Defendant Oxylabs, UAB ("Oxylabs") files this Answer to the Counterclaim found in Bright Data's Answer to Plaintiff's Second Amended Complaint for Patent Infringement filed in the above-referenced action (2:23-cv-00171-JRG-RSP) on April 14, 2023 (ECF No. 2) (the "Counterclaim") and Oxylabs' Counterclaims. All allegations in the Counterclaim not expressly admitted or specifically responded to by Oxylabs are denied.

**BRIGHT DATA'S COUNTERCLAIM**[1]

1.    Responding to Counterclaim Paragraph 1, Oxylabs admits that Bright Data, Ltd. ("BD") purports to assert a patent-infringement counterclaim against Oxylabs, UAB. Oxylabs

---

[1]    Per the Court's Order dated April 14, 2023, the above-referenced action "shall concern only the Fourth Counterclaim (Infringement of the '317 Patent) at ¶¶ 57-70." ECF No. 1 at 1. As such, Oxylabs only responds to these Paragraphs from the Counterclaim, and the relevant Paragraphs from the Counterclaim purportedly supporting BD's claim for alleged infringement of the '317 patent.

otherwise denies the allegations in this Counterclaim Paragraph.

### THE PARTIES

2.      Oxylabs admits that BD asserts that it is an entity organized and existing under the laws of Israel with its principal place of business at 4 Hamahshev St., Netanya 4250713, Israel, as alleged in Counterclaim Paragraph 2.

3.      Responding to Counterclaim Paragraph 3, Oxylabs states that it is an entity organized and existing under the laws of the Republic of Lithuania with its principal place of business at 32 Svitrigailos Street, 03230, Vilnius, Lithuania.

### JURISDICTION AND VENUE

4.      Counterclaim Paragraph 4 does not relate to the '317 patent, so no response is required. To the extent that a response is required, Oxylabs denies that BD's counterclaim in this lawsuit is for declaratory judgment for non-infringement and/or invalidity.

5.      Responding to Counterclaim Paragraph 5, Oxylabs states that it does not contest personal jurisdiction in the instant lawsuit only.

6.      Responding to Counterclaim Paragraph 6, Oxylabs states that it does not contest the Court's subject-matter jurisdiction over BD's counterclaim for infringement of the '317 patent.

7.      Counterclaim Paragraph 7 does not relate to the '317 patent, so no response is required. To the extent that a response is required, Oxylabs denies that the alleged actual and justiciable controversy exists in the above-referenced lawsuit.

8.      Responding to Counterclaim Paragraph 8, Oxylabs states that it does not contest venue in the instant lawsuit only.

### FACTUAL ALLEGATIONS

9.      Responding to Counterclaim Paragraph 9, Oxylabs admits that U.S. Patent No.

11,206,317 (the "'317 patent") issued on December 21, 2021, and lists Derry Shribman and Ofer Vilenski as its inventors. Oxylabs further admits that what appears to be a copy of the '317 patent is attached as Exhibit F to the Counterclaims. Oxylabs is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in Counterclaim Paragraph 9 and, therefore, denies the allegations.

10.    Responding to Counterclaim Paragraph 10, Oxylabs admits that the '317 patent states that it is titled "System Providing Faster and More Efficient Data Communication" and further states that it purports to have issue from application No. 17/332,290, which is a continuation of application No. 16/600,505, which is a continuation of application No. 16/278,109, which is a continuation of application No. 15/957,950, which is a continuation of application No. 14/025,109, which is a division of application No. 12/836,059, which was filed on July 14, 2010 and purports to claim priority to provisional application No. 61/249,624, filed on October 8, 2009. Oxylabs is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in Counterclaim Paragraph 10 and, therefore, denies the allegations.

11.    Responding to Counterclaim Paragraph 11, Oxylabs admits that the '317 patent was the subject of an *inter partes* review petition filed by Oxylabs on April 29, 2022. Oxylabs further admits that, on December 1, 2022, the PTAB denied institution of this *inter partes* review, and the PTAB's decision speaks for itself. Oxylabs admits that, on February 2, 2023, the PTAB denied Oxylabs' request for rehearing.

12.    Responding to Counterclaim Paragraph 12, Oxylabs denies that BD has a "patented residential proxy network." Oxylabs admits that BD (f/k/a Hola Networks Ltd.) and Oxylabs (f/k/a Tesonet, UAB) had a business relationship involving data center IPs. The allegations in this Counterclaim Paragraph 12 regarding Oxylabs' '948 patent do not relate to the '317 patent, so no

response is required. Oxylabs is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in Counterclaim Paragraph 12 and, therefore, denies the allegations.

13.    The allegations in Counterclaim Paragraph 13 do not relate to the '317 patent, so no response is required. Oxylabs denies that it released a residential proxy service based on BD's products.

14.    Responding to Counterclaim Paragraph 14, Oxylabs states that the content on its website speaks for itself. To the extent that BD has mischaracterized such content, Oxylabs denies the allegations in this Counterclaim Paragraph.

15.    Responding to Counterclaim Paragraph 15, Oxylabs admits that it offers various proxy services for sale. Oxylabs states that the content on its website speaks for itself. To the extent that BD has mischaracterized such content, Oxylabs denies the allegations in this Counterclaim Paragraph. Oxylabs further states that, to the extent that BD's characterizations in this Counterclaim Paragraph relate to claim construction, such characterizations are denied. Oxylabs otherwise denies the allegations in this Counterclaim Paragraph.

16.    Responding to Counterclaim Paragraph 16, Oxylabs admits that it offers various proxy services for sale. Oxylabs states that the content on its website speaks for itself. To the extent that BD has mischaracterized such content, Oxylabs denies the allegations in this Counterclaim Paragraph. Oxylabs further states that, to the extent that BD's characterizations in this Counterclaim Paragraph relate to claim construction, such characterizations are denied. Oxylabs otherwise denies the allegations in this Counterclaim Paragraph.

17.    Responding to Counterclaim Paragraph 17, Oxylabs admits that it offers various proxy services for sale. Oxylabs states that the content on its website speaks for itself. To the extent

that BD has mischaracterized such content, Oxylabs denies the allegations in this Counterclaim Paragraph. Oxylabs further states that, to the extent that BD's characterizations in this Counterclaim Paragraph relate to claim construction, such characterizations are denied. Oxylabs otherwise denies the allegations in this Counterclaim Paragraph.

18.    Responding to Counterclaim Paragraph 18, Oxylabs admits that it offers various proxy services for sale. Oxylabs states that the content on its website speaks for itself. To the extent that BD has mischaracterized such content, Oxylabs denies the allegations in this Counterclaim Paragraph. Oxylabs further states that, to the extent that BD's characterizations in this Counterclaim Paragraph relate to claim construction, such characterizations are denied. Oxylabs otherwise denies the allegations in this Counterclaim Paragraph.

19.    Oxylabs states that Counterclaim Paragraphs 19-56 do not relate to the '317 patent, so no response is required.

## BRIGHT DATA'S FOURTH COUNTERCLAIM
### (ALLEGED INFRINGEMENT OF THE '317 PATENT)

57.    Responding to Counterclaim Paragraph 57, Oxylabs incorporates the foregoing Paragraphs as if fully set forth herein.

58.    Responding to Counterclaim Paragraph 58, Oxylabs admits that the '317 patent states that it is titled "System Providing Faster and More Efficient Data Communication" and further states that it purports to have issue from application No. 17/332,290, which is a continuation of application No. 16/600,505, which is a continuation of application No. 16/278,109, which is a continuation of application No. 15/957,950, which is a continuation of application No. 14/025,109, which is a division of application No. 12/836,059, which was filed on July 14, 2010 and purports to claim priority to provisional application No. 61/249,624, filed on October 8, 2009. Oxylabs denies that the '317 patent was duly and legally issued by the U.S. Patent and Trademark Office,

5

at a minimum because the '317 patent is invalid. Oxylabs admits that what purports to be a copy of the '317 patent is attached as Exhibit F to BD's Counterclaim.

59.    Responding to Counterclaim Paragraph 59, Oxylabs admits that the '317 is presumed valid by statute, but denies that any claim of the '317 patent is valid and enforceable.

60.    Responding to Counterclaim Paragraph 60, Oxylabs admits that the '317 patent was the subject of an *inter partes* review petition filed by Oxylabs on April 29, 2022. Oxylabs further admits that, on December 1, 2022, the PTAB denied institution of this *inter partes* review, and the PTAB's decision speaks for itself. Oxylabs admits that, on February 2, 2023, the PTAB denied Oxylabs' request for rehearing.

61.    Oxylabs is without knowledge or information sufficient to form a belief as to the truth of the allegations in Counterclaim Paragraph 61 and, therefore, denies the allegations.

62.    Responding to Counterclaim Paragraph 62, Oxylabs states that BD appears to have transcribed claim 1 from the '317 patent correctly.

63.    Responding to Counterclaim Paragraph 63, Oxylabs admits that it offers various proxy services for sale. Oxylabs states that the content on its website speaks for itself. To the extent that BD has mischaracterized such content, Oxylabs denies the allegations in this Counterclaim Paragraph. Oxylabs further states that, to the extent that BD's characterizations in this Counterclaim Paragraph relate to claim construction, such characterizations are denied. Oxylabs otherwise denies the allegations in this Counterclaim Paragraph.

64.    Responding to Counterclaim Paragraph 64, Oxylabs admits that the '317 patent includes dependent claims. Oxylabs otherwise denies the allegations in this Counterclaim Paragraph.

65.    Responding to Counterclaim Paragraph 65, Oxylabs admits that it has known of the

'317 patent at least since Oxylabs filed its *inter partes* review petition concerning the '317 patent.

66.     Oxylabs denies the allegations in Counterclaim Paragraph 66.

67.     Oxylabs denies the allegations in Counterclaim Paragraph 67.

68.     Oxylabs denies the allegations in Counterclaim Paragraph 68.

69.     Oxylabs denies the allegations in Counterclaim Paragraph 69.

70.     Oxylabs denies the allegations in Counterclaim Paragraph 70.

### BRIGHT DATA'S PRAYER FOR RELIEF

71.     Oxylabs admits that BD requests certain relief from the Court. Oxylabs denies that BD is entitled to any relief.

### BRIGHT DATA'S DEMAND FOR JURY TRIAL

72.     Oxylabs admits that BD has demanded a trial by jury of all issues so triable. Oxylabs demands, pursuant to Federal Rule of Civil Procedure 38, a trial by jury on all issues so triable.

### DEFENSES

73.     Without altering the burden of proof, Oxylabs asserts the following defenses, which are based upon an investigation that is not complete. Oxylabs' investigation of its defenses is continuing, and Oxylabs reserves the right to assert all defenses under Federal Rule of Civil Procedure 8, the patent laws of the United States, and any other defense, at law or in equity, that may now exist or in the future be available based upon, among other things, discovery and further investigation in this case.

### FIRST DEFENSE
### (FAILURE TO STATE A CLAIM)

74.     BD's Counterclaim fails to state a claim upon which relief can be granted.

**SECOND DEFENSE**
**(NON-INFRINGEMENT)**

75.     Oxylabs has not directly or indirectly, literally or under the doctrine of equivalents, infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the '317 patent, and is not liable for infringement thereof.

**THIRD DEFENSE**
**(INVALIDITY / SUBJECT MATTER ELIGIBILITY)**

76.     The claims of the '317 patent are invalid and/or void for failure to meet the conditions for patentability specified by 35 U.S.C. §§ 101 *et seq.*, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112 and/or 282 and/or the Rules and Regulations of the United States Patent & Trademark Office.

**FOURTH DEFENSE**
**(LIMITATION ON DAMAGES)**

77.     BD's claims for relief are limited by 35 U.S.C. §§ 286-288 and/or 28 U.S.C. § 1498.

**FIFTH DEFENSE**
**(PROSECUTION HISTORY ESTOPPEL)**

78.     By reason of proceedings in the United States Patent & Trademark Office, and by reasons of amendments, statements, admissions, omissions and/or representations made by the applicants or on their behalf, BD is estopped from asserting infringement of the '317 patent against Oxylabs.

**SIXTH DEFENSE**
**(DISCLOSURE-DEDICATION)**

79.     BD's claims are barred to the extent that BD has dedicated to the public systems, methods, and/or products disclosed in the '317 patent but not literally claimed therein.

**SEVENTH DEFENSE**
**(EXTRATERRITORIALITY)**

80.     Oxylabs asserts that BD's claims are barred, in whole or in part, by

extraterritoriality principles. For example, the '317 patent does not apply outside of the United States and, further, all steps of the methods of the asserted claims must be performed entirely in the United States. *See, e.g.*, *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005).

### EIGHTH DEFENSE
### (FAILURE TO MARK)

81. To the extent that BD, its predecessors, or licensees of the '317 patent failed to properly mark any relevant products or materials as required by 35 U.S.C. § 287, BD's alleged damages are barred in whole or in part.

### JURY DEMAND (ANSWER)

82. Oxylabs demands, pursuant to Rule 38 of the Federal Rules of Civil Procedure, a trial by jury on all issues so triable.

### OXYLABS' PRAYER FOR RELIEF (ANSWER)

83. Oxylabs requests that the Court enter a judgment in Oxylabs' favor as follows:

A. Dismissing BD's Counterclaim in its entirety, with prejudice;

B. Declaring that BD is not entitled to any relief, whether in law or equity or otherwise, from its suit against Oxylabs;

C. Declaring that Oxylabs does not infringe and has not infringed the '317 patent;

D. Declaring that the claims of the '317 patent are invalid, unenforceable, and/or not eligible for patent protection;

E. Permanently enjoining BD, its successors and assigns, and anyone acting in concert therewith or on its behalf, from attempting to enforce the '317 patent

against Oxylabs or any parents, affiliates, or subsidiaries of Oxylabs or any of their respective officers, agents, employees, successors, and assigns;

F.    Declaring that this is an exceptional case in Oxylabs' favor pursuant to 35 U.S.C. § 285;

G.    Awarding Oxylabs its costs, expenses, and reasonable attorney's fees, whether pursuant to 35 U.S.C. § 285 or otherwise; and

H.    Entering an Order that Oxylabs shall have and recover from BD any and all such other and further relief, general and special, at law or in equity, to which Oxylabs may be justly entitled.

## COUNTERCLAIMS

84.    Pursuant to Federal Rule of Civil Procedure 13, Oxylabs files these Counterclaims against BD. Oxylabs alleges, based on personal knowledge with respect to its own actions and upon information and belief with respect to all others' actions, as follows:

### PARTIES

85.    Oxylabs is an entity organized and existing under the laws of the Republic of Lithuania with its principal place of business at 32 Svitrigailos Street, 03230, Vilnius, Lithuania.

86.    BD states that it is an entity organized and existing under the laws of Israel with its principal place of business at 4 Hamahshev St., Netanya 4250713. BD designs, manufactures, makes, uses, provides, imports into the United States, sells and/or offers for sale in the United States the patented inventions of United States Patent No. 7,010,526 (the "'526 patent") (Ex. 1) and United States Patent No. 7,020,667 (the "'667 patent") (Ex. 2) (collectively, the "Asserted Patents"), including within this District, specifically including the Datasets product and related proxy and unblocking infrastructure/proxy network(s) (e.g., Web Unlocker, residential proxies,

10

data center proxies, etc.) (the "Accused Datasets Product") and the Web Scraper IDE (f/k/a Data Collector) product and related proxy and unblocking infrastructure/proxy network(s) (e.g., Web Unlocker, residential proxies, data center proxies, etc.) (the "Accused Web Scraper IDE Product") (collectively, the "BD Accused Products").

<u>**JURISDICTION AND VENUE**</u>

87.    These Counterclaims arise under the Patent Act, 35 U.S.C. § 1 *et seq.* and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

88.    The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202, as well as 35 U.S.C. § 1 *et seq.*

89.    This Court has personal jurisdiction over BD by virtue of, at a minimum, the filing of BD's Counterclaims. By filing BD's Counterclaims, BD has consented to the personal jurisdiction of this Court. This Court also has personal jurisdiction over BD by virtue of BD's business activities in this District and the State of Texas, including but not limited to the sale of products that infringe Oxylabs' Asserted Patents in the State of Texas and this District. BD, via itself or its subsidiaries or affiliates, regularly conducts and transacts business throughout the United States, in the State of Texas, and within the Eastern District of Texas in a manner that establishes sufficient minimum contacts with this forum. BD has employees in the United States, including in Texas, that are customer facing in nature, including in sales. BD transacts substantial business in the State of Texas, directly or through agents, including by (i) engaging in the infringement alleged herein, at least in part, in the State of Texas, and (ii) regularly doing or soliciting business in the State of Texas, engaging in other persistent courses of conduct, maintaining continuous and systematic contacts within this Judicial District, purposefully availing itself of the privilege of doing business in the State of Texas, and/or deriving substantial revenue from services provided in the State of

Texas. For example, BD offers for sale, sells, and advertises (including the provision of an interactive web page) the BD Accused Products in the State of Texas and the Eastern District of Texas, placing the BD Accused Products into the stream of commerce with the knowledge, understanding, and/or intention that they be used by customers located in the State of Texas, including the Eastern District of Texas. BD's interactive website, available in the Eastern District of Texas and the Marshall Division, provides customers and potential customers with information about the BD Accused Products; the ability to "Start Free Trial," "Request Dataset," "Request Dataset Sample," and/or "Get A Quote" for the BD Accused Products; the ability to "Contact Sales" for a "Free Trial Request" of the Accused Web Scraper IDE Product or a "Data Request" of the Accused Datasets Product; pricing information associated with the BD Accused Products; videos on BD's YouTube channel instructing users how to use "a ready-made Data Collector on the Bright Data Control Panel;" and a "FAQ" (frequently asked questions) or help guide specifically addressing each BD Accused Product.

90.    The BD Accused Products include and/or rely on BD's proxy network(s), such network(s) being located throughout the United States, in Texas, and in the Eastern District of Texas.

91.    BD (including under its previous name Luminati Networks, Ltd.) has previously been the subject of jurisdiction in this Court, itself filing multiple patent-infringement lawsuits against Oxylabs (and others).

92.    This Court has general jurisdiction over BD due to its continuous and systematic contacts with the State of Texas and this jurisdiction. Further, BD is subject to this Court's jurisdiction because it has committed (and continues to commit) patent infringement in the State of Texas and this District.

93.    An actual and justiciable controversy exists concerning at least: (i) the non-

infringement of the '317 patent, (ii) the invalidity and lack of subject-matter eligibility of the '317 patent, and (iii) BD's infringement of the '526 and '667 patents.

94.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because, at a minimum, BD's claims of infringement are pending in this Court, a substantial part of the events or omissions giving rise to this lawsuit occurred in the Eastern District of Texas and/or because BD is subject to personal jurisdiction in the Eastern District of Texas. Venue is also proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391(c)(3), as BD is not a resident of the United States and, accordingly, it may be sued in any judicial district. Additionally, BD (including under its previous name Luminati Networks, Ltd.) has previously utilized this venue, itself filing multiple patent-infringement lawsuits against Oxylabs (and others) in the Eastern District of Texas (including BD's Counterclaim asserted in this action).

### FACTS

95.    On February 14, 2023, BD sued Oxylabs for alleged infringement of the '317 patent.

96.    BD asserts that "[e]ach and every claim of the '317 Patent is valid and enforceable, and each enjoys a statutory presumption of validity under 35 U.S.C. § 282." ECF No. 2 ¶ 59.

97.    BD asserts that "Oxylabs offers various proxy services supporting the ability to select a geographic location for a request including, but not limited to, Oxylabs' 'Residential Proxies,' 'Mobile Proxies,' 'Shared Datacenter Proxies,' and 'Web Unlocker' [sic] as well as Oxylabs' Proxy Extension for Chrome and Proxy Manager for Android ('Accused Oxylabs Services.')." ECF No. 2 ¶ 15.

98.    BD purports to assert that Oxylabs infringes the '317 patent through the "Accused Oxylabs Services provid[ing] proxy services permitting its customers to fetch web-pages from web

13

servers using proxies selected by geographical location." ECF No. 2 ¶¶ 63-67.

99.     Neither Oxylabs nor the "Accused Oxylabs Services" infringe any claim of the '317 patent, whether directly or indirectly, literally or under the doctrine of equivalents.

100.    Additionally, the '317 patent is invalid and/or claims unpatentable subject matter.

101.    Oxylabs is a leading provider of proxy services. Oxylabs' products include Scraper APIs, including its SERP Scraper API, E-Commerce Scraper API, Real Estate Scraper API, and Web Scraper API. *See generally* Ex. 3. Oxylabs' Scraper APIs were formerly marketed under the product name Real-Time Crawler.

102.    Oxylabs' SERP Scraper API allows Oxylabs' customers to get real-time search engine data, including parsed data from both organic and paid results. Oxylabs' E-Commerce Scraper API allows Oxylabs' customers to collect product, search, and other data from leading e-commerce marketplaces or standalone shops. Oxylabs' Real Estate Scraper API allows Oxylabs' customers to gather pricing, location, property type, and other data from popular real estate websites. Oxylabs' Web Scraper API allows Oxylabs' customers to extract public data from even the most advanced and complex targets, making data gathering easier for any custom web-scraping project. Each of Oxylabs' Scraper APIs is powered by Oxylabs' proxy infrastructure, which includes over 100 million IPs (residential, data center, and others) located throughout the world. *See generally id*.

103.    BD competes with Oxylabs. BD claims to be "the world's #1 web data platform." *See* Ex. 4. BD advertises various data collection products, including "Datasets" and "Web Scraper IDE." *Id.* BD further advertises its proxy infrastructure, which is utilized by its various data collection products. *Id.* BD's proxy infrastructure includes at least residential proxies, data center proxies, ISP proxies, and mobile proxies. *See generally id*; *see also* Ex. 5.

14

104.    The '526 patent, titled "Knowledge-Based Data Mining System," issued on March 7, 2006. Ex. 1. Matthew Denesuk, Daniel Frederick Gruhl, Kevin Snow McCurley, Sridhar Rajagopalan, and Andrew S. Tomkins are the named inventors of the '526 patent. The '526 patent application (No. 10/141,686) was filed May 8, 2002.

105.    Oxylabs, UAB is the assignee and sole owner of the '526 patent.

106.    The '667 patent, titled "System and Method for Data Retrieval and Collection in a Structured Format," issued on March 28, 2006. Ex. 2. Michael Alan Guest and Frederick Thomas Sharp are the named inventors of the '667 patent. The '667 patent application (No. 10/198,827) was filed July 18, 2002.

107.    Oxylabs, UAB is the assignee and sole owner of the '667 patent.

108.    Oxylabs has offered its Scraper API and/or Real-Time Crawler service in a manner that practices one or more claims of the '526 patent and the '667 patent. *See, e.g.*, Ex. 6.

109.    The filing and service of these Counterclaims constitute actual notice of BD's infringement of Oxylabs' Asserted Patents.

110.    Upon information and belief, despite having notice of the Oxylabs Asserted Patents, BD continues to infringe the Oxylabs Asserted Patents, as explained in detail below.

**Accused Datasets Product**

111.    BD offers the Accused Datasets Product for sale, claiming its customers can use the Datasets Product to "[c]apture entire sites, including millions of pages and data points, in key industry verticals. Optional to refresh datasets regularly." Ex. 7; *see also* https://www.youtube.com/watch?v=ORalsPRl_KI. BD further claims that the Datasets Product provides its customers the ability to "[a]ccess structured public web data for any use case," as well as "a data feed of now records or filter existing datasheets for a cost-effective and time-saving

solution." Ex. 8. Further, according to BD's website, the Accused Datasets Product provides "Enriched Datasets." Ex. 7.

112. BD describes "Enriched Datasets" in a BD blog post titled "Retrieving 'Datasets': The stuff that unicorns are made of!" where BD advertises and instructs customers and potential customers on how to use the Accused Datasets Product. Ex. 9; *see also* Ex. 10. There, BD describes "Enriched Datasets" as "[a]n additional layer of information on top of what was collected from the original target website, either by cross-referencing data points from another data source or by processing existing information to identify and create extra fields and parameters. For example, identifying the main areas of interest for a certain social media influencer or by matching product details across different eCommerce platforms." *Id*.

113. The enriched datasets are described further in a BD blog post titled "Web Data Collection in 2022—Everything you need to know." Ex. 11; *see also* Ex. 12. The "Merged/Enriched Datasets" are described as "a complete data trove of information collected across multiple target sites giving a wider view of a given business question or challenge. For example, social sentiment regarding a certain stock or product across four different social media platforms (Reddit, [Facebook, Instagram,] Twitter)." *Id*. Per BD's website, its customers can "[i]ncrease the value and usability of [their] dataset by integrating multiple data sources to create a valuable enriched dataset." Ex. 7.

114. BD also describes "Differential datasets" that BD sells in connection with its Accused Datasets Product. BD describes "Differential datasets" as "when the same data points are collected periodically for monitoring changes and trends on a daily, weekly, or monthly basis. For example, the change in the number of professionals in the employ of startups in the medical

16

industry as displayed on the companies' official pages/profiles or changes in bestseller product trends for specific categories on an eCommerce site or a given brand's market share." Ex. 9; Ex. 10.

115.    Regarding the Accused Datasets Product, BD receives a request from a customer for "complete datasets," "customize[d] existing datasets," and/or custom datasets from "any public website, tailored to your requirements." Ex. 7. For example, BD's website includes a list of "Popular Datasets" that include "LinkedIn Datasets," "Amazon Datasets," "Twitter Datasets," and many others. Ex. 8. BD's website also includes the ability of a customer to select "Custom Datasets" described as "Choose your domain." *Id.* ("Can't find what you're searching for? Let us know what dataset you need and we'll create it for you."). The Accused Datasets Product can "[c]ustomize an existing dataset based on location, category, or any other parameter to create the subset you want." Ex. 7.

116.    BD's FAQ/help website describes how customers can "filter" datasets using the Accused Datasets Product. Ex. 13. This filtering includes region filters, boolean filters, timestamp filters, and others. *Id.*

117.    The Accused Datasets Product maintains datasets "based on website structure changes," and customers can sign up for a "subscription" that provides a "[d]ate feed of new/updated records, based on a predefined schedule." Ex. 14. "Most of [BD's] datasets are updated monthly" and "[t]he 'timestamp' field in each record indicates when it was collected[,]" allowing customers to "use the timestamp filter to limit results to the requested period." *Id.* BD also "store[s] some or all of [a refreshed dataset's] past values; for most datasets, [BD has] up to 1 year of historical data." *Id.*

118.    The Accused Datasets Product responds to customer requests with the requested datasets "delivered to [the customer's] preferred storage." Ex. 7. "Multiple delivery options," including "Amazon S3, Google Cloud PubSub, SFTP, and Microsoft Azure" are available. Ex. 14. And "[d]ifferent file output formats," including "JSON, ndJSON, CSV, or Excel" are also available. *Id.*

119.    BD describes "the difference between Data Collector and Datasets" as follows: "The Data Collector platform is operated by you or your Bright Data account manager. With our Datasets product we deliver the data hands-free. In addition, datasets usually refer to entire domains or a significant segment of a domain. For instance, 'all of LinkedIn.'" Ex. 15.

### Accused Web Scraper IDE Product

120.    BD offers the Accused Web Scraper IDE Product (formerly known as BD's Data Collector Product) for sale, claiming its customers can use the Web Scraper IDE to "[b]uild web scrapers with [BD's] hosted IDE, powered by robust unblocking proxy infrastructure, ready-made scraping functions, and code templates of popular websites." Ex. 16. BD claims that its Web Scraper IDE is a "[w]eb scraper designed for developers, built for scale." *Id.* According to BD, its Web Scraper IDE is "[e]verything you need from a web scraping solution." *Id.* BD's website discussing its Web Scraper IDE includes the following diagram describing the product:

18



*Id.*

121.    BD's website further states that aspects of the Accused Web Scraper IDE Product include "73+ Ready-made JavaScript functions," "38K+ Scrapers built by [BD's] customers," and "195 Countries with proxy endpoints." *Id.* BD offers "code templates and pre-built JavaScript functions" in connection with its Web Scraper IDE. *Id.* "Web Scraper IDE Features" include "Pre-made web scraper templates," "Ready-made functions" that include "[c]apture browser networks calls, configure a proxy, extract data from lazy loading UI, and more," and "Easy parser creation" that allows customers to "[w]rite [their] parsers in cheerio and run live previews to see what data it produced." *Id.* Per the "Integration" feature, customers can "[t]rigger crawls on a schedule or by API and connect [BD's] API to major storage platforms." *Id.*

122.    A BD blog post titled "The Bright Data Top Products Lineup" advertises and instructs customers and potential customers on how to use the Accused Web Scraper IDE Product. *See* Ex. 17; Ex. 18. The Web Scraper IDE is described as "one of the only tools out there that can put your company's data collection efforts on autopilot." Ex. 18. The "[t]op product features" discussed in the blog post include "[z]ero in-house infrastructure required," and "[a]dapts to real-

time changes, and blockades to ensure you always gain access to your target datasets." *Id.* The "[t]op product features" discussed in the blog post also include "[t]he datasets that are delivered are ready-to-use in your format of choice e.g. API, Webhook, Amazon S3 bucket etc." *Id.* The "[h]ow it works" portion of the blog post explains that customers can either "choose from an existing data collector, ask [BD] to build you a customized one, or build your own using [BD's] IDE." *Id.* The "[h]ow it works" portion of the blog post further explains that the customer "decide[s] on your delivery preferences such as how often you want data collected and delivered" and that the customer's "target data is delivered directly to [the customer's] teams or designated algorithms in a ready-to-use format (JSON, CSV, Excel, etc)." *Id.*

123.    BD's Data Collector Start Guide advertises and instructs customers and potential customers on how to use BD's Data Collector, now known as the Web Scraper IDE. Ex. 19. Customers and potential customers are given the option to (i) "search [BD's] ready-made collectors," (ii) "browse existing collectors by use case," and/or (iii) perform a "domain-based search." *Id.* Customers and potential customers are also instructed on how to either use (i) BD's own templates, described as "public collectors created by Bright Data that are available for all customers," or (ii) customer templates, described as a collector developed by the customer "using [BD's] in-house IDE, equipped with all sorts of tools (like methods and preview tools) to help you in the development." Customers and potential customers are further instructed on how to "[u]se 'Filters' to get more specific results[,]" including to collect all data from a website by URL, via keyword, or by category. *Id.* BD also offers to develop customer templates and/or custom collectors for customers and potential customers. *Id.*

124.    BD's FAQ website further explains that "[t]he Data Collector delivers enormous amounts of raw data in a structured format, and integrates with existing systems, for immediate

20

use in competitive data-driven decisions." Ex. 20. An "input" for the Web Scraper IDE/Data Collector is "the parameters you'll enter to run your collection with. This can include keywords, URL, search items, product ID, ASIN, profile name, check in and check out dates, etc." Ex. 21. The "output" for the Web Scraper IDE/Data Collector "is the data that you've collected from a platform based on your input parameters. You'll receive your data as JSON/NDJSON/CSV/XLSX." Ex. 22.

125.    BD's customers can use the Accused Web Scraper IDE Product by either requesting a managed collector or developing a self-managed collector:



Ex. 23.

126.    BD has developed hundreds of Data Collectors for its customers and potential customers. BD's FAQ/help website states that "Bright Data has developed hundreds of Data Collectors customized to popular platforms." Ex. 24. BD uses its own public data collectors (including testing) to support BD's customers' general use cases. When requesting a managed collector, BD's customers create and define the project, define the output schema (including "'parsed data' fields"), and add target website URLs and define input (e.g., keywords). Ex. 25.



*Id.* (describing "Mapping the Data" by the use of "Parsed data" fields).

127.    BD's FAQ/help website explains that BD also provides the "Data Collector IDE" to its customers and potential customers: "The Data Collector's IDE is its integrated development environment," where BD's customers and potential customers can build their own collectors, debug and diagnose issues, bring their own collectors to production, perform browser scripting,

create parsers, and more. Ex. 26; *see also* Ex. 27 (describing step "B" in the data collector process as "Parser code – Parse the HTML results you gathered from the interaction window").

128.    BD's FAQ/help website advertises and instructs customers and potential customers on how to use the Web Scraper IDE to create templates. Ex. 28; *see also* Ex. 29; Ex. 30. BD's FAQ website demonstrates how customers and potential customers can select specific data on a site to be collected by the Web Scraper IDE. *See, e.g.*, Ex. 31; Ex. 32; *see also* https://youtu.be/V6qR8bNsHS4. BD also provides "Parser code" at its FAQ/help website. *See, e.g.*, Ex. 33.

129.    BD's Data Collector Start Guide further advertises and instructs customers and potential customers on how to "change the way the collector will format each output field in the results," providing a graphic example:



Ex. 19.

130.    The Data Collector Start Guide describes the ability "to 'turn off' unwanted fields," which causes the Web Scraper IDE to parse the target website when collecting and/or providing output results. *Id.*; *see also* https://www.youtube.com/watch?v=LG6yiUoyAYw&t (discussing "Set outputs"); Ex. 4 (the "Scraping" drop-down menu describing the "Web Scraper IDE" product as "Scrape public web data in real-time or in batches"); Ex. 34 ("A parser doesn't convert every single data sequence but identifies what information in the HTML string needs to be converted.") ("Start Parsing Data with Bright Data's Data Collector"); Ex. 35 ("A data parser is a tool that takes data in one format and returns it in another. Thus, a data parser receives data as input, elaborates it, and returns it in a new format as output."); *id.* ("Web Scraper IDE is a fully-featured tool for developers that offers ready-made parsing functions and approaches."). The parsed data is collected from the target website.

131.    BD's FAQ/help website provides similar information and instructions concerning the Accused Web Scraper IDE Product:



Ex. 36 (showing configurable "Parsed data" fields).

132.    BD's Data Collector Start Guide further advertises and instructs customers and potential customers on how to utilize the Accused Web Scraper IDE Product to receive responses to data collector requests in "CSV (table)," "CSV (flat)," and "JSON" formats:

25



Ex. 19.

133.    BD's FAQ/help page provides similar information. *See* Ex. 22 ("You'll receive your data as JSON/NDJSON/CSV/XLSX."); Ex. 37 (listing "JSON, NDJSON, CSV, XLSX" as the "available formats for datasets").

134.    Specific to the Accused Web Scraper IDE Product's delivery configurations, BD's Data Collector Start Guide explains that the data can be delivered by "Email," "Webhook," "Amazon S3," "Google Cloud Storage," "SFTP," and "Microsoft Azure Storage":



Ex. 19.

135.    The portion of BD's website specifically discussing the Accused Web Scraper IDE Product includes similar information addressing the target databases/locations where the collected data may be sent:



**4  Data delivery integrations**

Deliver the data via all the popular storage destinations:

- API
- Amazon S3
- Webhook
- Microsoft Azure
- Google Cloud PubSub
- SFTP

Ex. 16; *see also* Ex. 38 (BD's FAQ/help website: "Your data can be delivered to you by email, Webhook, Amazon S3, Google Cloud Storage, SFTP, and Microsoft Azure."); Ex. 39 (when discussing the Accused Data Collector Product, stating: "The act of scraping entails identifying the open-source data that is of interest, copying it, and then storing it in a database and/or spreadsheet so that it can then be used by algorithms and teams in order to make important business decisions.").

136.    The collected data includes, among other things, the URL(s) associated with the collected data. *See, e.g.*, https://www.youtube.com/watch?v=LG6yiUoyAYw&t (at 3:43, including URL data); https://www.youtube.com/watch?v=q8kFe5MPAC0&t (at 25:00, including URL data).

137.    BD's Data Collector Start Guide further advertises and instructs customers and potential customers on how to utilize the Accused Web Scraper IDE Product via its "Run on schedule" feature, which allows for the collector to automatically run on a schedule frequency:



Ex. 19.

138.    BD's FAQ/help website provides similar information/instruction to BD's customers:

Bright Data › Datasets & Web Scraper IDE › Getting started with Web Scraper IDE

## What are the options to initiate requests?

We have 3 option to initiate requests:

- Initiate by API - regular request, queue request and replace request.
- Initiate manually.
- Schedule mode

Ex. 40 (referencing "Schedule mode").

## Dashboard - Collector action menu

The collector action menu allows performing different actions with the collector.

- **Initiate by API** - start a data collection without having to enter the control panel
- **Initiate manually** - Bright Data's control panel makes it easy to get started collecting data
- **Run on schedule** - select precisely when to collect the data you need

Ex. 41; *see also* https://www.youtube.com/watch?v=LG6yiUoyAYw&t (at 3:16: "Run the collector automatically on a predefined schedule, every hour, every day, or every week.").

139.    BD's website further advertises and instructs customers and potential customers specifically in the "e-commerce" use case regarding why and how to use the Accused Web Scraper IDE Product. Ex. 42. For example, BD's "e-commerce" use case website states that its customers and potential customers can "[m]onitor competitor inventory and pricing in real-time with Data Collector, the world's #1 platform for e-commerce and retail website data," including the following graphic representing the Web Scraper IDE Product:



*Id.*

140.    In the "[h]ow it works" portion of BD's "e-commerce" use case website, BD explains that the first step is to "[c]hoose the websites to collect from," the second step is to "[s]elect the frequency: real-time or scheduled, and delivery format: JSON, CSV, HTML, or Microsoft

Excel," and the third step is to "[d]ecide where to send the data: webhook, email, Amazon S3, Google Cloud, Microsoft Azure, SFTP, or API." *Id.*

141.    The portion of BD's website discussing the Accused Web Scraper IDE Product also discusses the use of the product in the specific contexts of "eCommerce," "Social Media," "Business," "Travel," and "Real Estate." Ex. 16.

142.    As noted above, BD describes "the difference between Data Collector and Datasets" as follows: "The Data Collector platform is operated by you or your Bright Data account manager. With our Datasets product we deliver the data hands-free. In addition, datasets usually refer to entire domains or a significant segment of a domain. For instance, 'all of LinkedIn.'" Ex. 15. BD advertises the connection between its Datasets product and its Web Scraper IDE (f/k/a Data Collector) on the "Datasets" portion of BD's website:



Ex. 8.

143.    BD also advertises the connection between its Datasets product and its Web Scraper IDE on the "Web Scraper IDE" portion of BD's website. Ex. 16 (diagram showing that the output of the Web Scraper IDE is a "Dataset"). Upon information and belief, BD uses its Web Scraper IDE to support/create Datasets (including "pre-collected Datasets"). *See, e.g.*, Ex. 12.

144.    BD updates its Datasets on a regular basis. For example, BD states that "[m]ost of our datasets are updated monthly. The 'timestamp' field in each record indicates when it was collected, you can use the timestamp filter to limit results to the requested period." Ex. 14. BD allows its customers to subscribe to a Datasets "Subscription" of a "[d]ata feed of new/updated records,

based on a predefined schedule." *Id.*; *see also* Ex. 8 ("Get updated or new records from your pre-ferred dataset daily, weekly, biweekly, or monthly based on your chosen schedule."). "Differential Datasets," for example, are datasets for which "the same data points are collected periodically for monitoring changes and trends on a daily, weekly, or monthly basis." Ex. 9.

145.    The Accused Web Scraper IDE Product includes, uses, and/or relies on BD's proxy and unblocking infrastructure/proxy networks, including its network of residential and data center proxies. For example, the portion of BD's website discussing the Accused Web Scraper IDE Prod-uct includes a diagram (shown above) indicating the Web Scraper IDE's reliance on BD's "Proxy & Unblocking Infrastructure." *Id.*

146.    Similarly, BD's website asserts that the Web Scraper IDE includes "Built-in Proxy & Unblocking" that "[e]mulate[s] a user in any geo-location with built-in fingerprinting, auto-mated retries, CAPTCHA solving, and more." *Id.* Notably, these functionalities are the same func-tionalities BD discusses in relation to its Web Unlocker product. *See, e.g.*, Ex. 43. Upon infor-mation and belief, the Accused Web Scraper IDE Product utilizes the Web Unlocker as part of its proxy and unblocking infrastructure/proxy networks.

147.    As another example, a BD webinar titled "How to Automate your Data Collection | Luminati Data Collector Webinar | Dec - 21 2020"[2] includes a discussion of the "data collection pyramid," the bottom of which includes a listing of BD's various proxy networks: data center, static residential, rotating residential, and mobile:

---

[2]    The description associated with this webinar states that "[t]his webinar was entirely dedi-cated to Luminati's Data Collector, including a live demo, as well as discussing key obstacles, and opportunities of end-to-end automation." *See* https://www.youtube.com/watch?v=q8kFe5MPAC0. It further states that, "[a]fter attending this webinar you will: Get practical tools to help your company benefit and transition to an automated data solution." *Id.*



*See* https://www.youtube.com/watch?v=q8kFe5MPAC0.

148.   A BD employee presenter states during the webinar that BD's Data Collector customers "don't have to build all the infrastructure around a crawler—they just have to say what it does, and then we handle the scaling and we handle the operations." *Id.* The same presenter further states that the Data Collector is "an ethical approach" because "all of the peers that are part of our residential network are opt-in," demonstrating that the Data Collector utilizes at least BD's residential proxy network. *Id.*

149.   The webinar titled "How to Automate your Data Collection | Luminati Data Collector Webinar | Dec - 21 2020" concludes with a question-and-answer session. *Id.* The first question posed to the two BD employee presenters is as follows: "How do we say what type of peers to use, data center, residential, etc., what kind of peers?" *Id.* A BD employee responds: "The quick answer will be that you will not need to use or to choose what kind of, what type of network you want to use because we will do it in the background for you, meaning that you will only need to develop the collector and we will chose the right network for you." *Id.*

## COUNT I
### (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF '317 PATENT)

150.    Oxylabs incorporates the foregoing paragraphs by reference as if fully set forth herein.

151.    This is an action for declaratory judgment of non-infringement of any and all valid and enforceable claims of the '317 patent.

152.    BD has alleged in its Counterclaim that Oxylabs has infringed one or more claims of the '317 patent.

153.    Oxylabs has not in any manner infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the '317 patent, either directly or indirectly, or literally or under the doctrine of equivalents, and is not liable for infringement thereof.

154.    Oxylabs requests a judicial determination and declaration of the respective rights and duties of the parties. Such a determination and declaration are necessary and appropriate at this time so that the parties may ascertain their respective rights and duties in this regard.

155.    This is an exceptional case entitling Oxylabs to an award of its attorney's fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNT II
### (DECLARATORY JUDGMENT OF INVALIDITY AND/OR LACK OF SUBJECT MATTER ELIGIBILITY OF '317 PATENT)

156.    Oxylabs incorporates the foregoing paragraphs by reference as if fully set forth herein.

157.    This is an action for declaratory judgment of invalidity and/or lack of subject matter eligibility of any and all claims of the '317 patent.

158.    The '317 patent is invalid and/or void for failure to meet the conditions for patent-ability specified by 35 U.S.C. § 101 *et seq.*, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112 and/or 282 and/or the Rules and Regulations of the United States Patent & Trademark Office.

159.    Oxylabs requests a judicial determination and declaration of the respective rights and duties of the parties. Such a determination and declaration are necessary and appropriate at this time so that the parties may ascertain their respective rights and duties in this regard.

160.    This is an exceptional case entitling Oxylabs to an award of its attorney's fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

**COUNT III**
**(INFRINGEMENT OF OXYLABS' '526 PATENT)**

161.    Oxylabs incorporates the foregoing paragraphs by reference as if fully set forth herein.

162.    A true and accurate copy of the '526 patent is attached hereto as Exhibit 1.

163.    All claims of the '526 patent are valid and enforceable, and each enjoys a statutory presumption of validity under 35 U.S.C. § 282.

164.    Oxylabs is the sole owner of the '526 patent and possesses rights to past damages.

165.    Independent claim 1 of the '526 patent recites:

> 1. A method for data mining, comprising:
>
> crawling the Internet to return Web pages to a data store;
>
> accessing the data store with at least a first data miner to process data in the store and output at least one result;
>
> receiving a customer request for information;
>
> creating at least a second data miner in response to the customer request for information, the second data miner accessing at least the result of the first data miner to generate an output; and

at least partially based on the output of the second data miner, responding to the customer request for information.

166.    As described above, BD has infringed (both literally and/or under the doctrine of equivalents) and/or induced infringement of the '526 patent by designing, manufacturing, making, using, providing, importing into the United States, selling and/or offering for sale in the United States, or by intending that others perform such acts, products and/or methods covered by at least claim 1 of the '526 patent, including but not limited to the Accused Datasets Product.

167.    As described above, BD designs, manufactures, makes, uses, provides, imports into the United States, sells and/or offers for sale in the United States the Accused Datasets Product and thus directly infringes (both literally and/or under the doctrine of equivalents) the '526 patent.

168.    As described above, upon information and belief, the Accused Datasets Product crawls the Internet to return Web pages to a data store. The Accused Datasets Product accesses the data store with at least a first data miner to process data in the store and output at least one result. The Accused Datasets Product also receives a customer request for information and, upon information and belief, creates at least a second data miner in response to the customer request for information. Upon information and belief, the second data miner accesses at least the result of the first data miner to generate an output. Upon information and belief, the Accused Datasets Product then responds to the customer request for information at least partially based on the output of the second data miner.

169.    BD also indirectly infringes the '526 patent. BD has had actual notice of the '526 Patent since at least the filing of these Counterclaims, and knows at least from these Counterclaims that the Accused Datasets Product practices the steps of at least claim 1 of the '526 patent. Upon information and belief, BD also received actual notice of the '526 patent when it reviewed Oxylabs' website at https://oxylabs.io/legal/oxylabs-patents.

170.    BD indirectly infringes the '526 patent by inducing infringement by others, such as BD's customers that use the Accused Datasets Product, in this District and elsewhere in the United States. For example, BD's customers directly infringe at least claim 1 of the '526 patent when they use the Accused Datasets Product as intended and instructed by BD. As explained above, BD instructs its customers (and potential customers) regarding how to use the Accused Datasets Product (including how to create and use custom datasets via BD's Datasets Product). Such instructions include BD's website and blogs discussing the Datasets Product (Ex. 4; Exs. 7-12; Ex. 14), BD's FAQ/help website (e.g., Ex. 13), and BD's YouTube channel (https://www.youtube.com/channel/UCM_0cG1ljAoEUcZIyoUIq6g), including videos on that channel discussing the Accused Datasets Product (*see, e.g.*, the BD video at https://www.youtube.com/watch?v=ORalsPRl_KI).

171.    As a result of BD's infringement of the '526 patent, Oxylabs has suffered and continues to suffer damages. Thus, Oxylabs is entitled to recover from BD the damages Oxylabs sustained (and continues to sustain) because of BD's wrongful and infringing acts in an amount no less than Oxylabs' lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court together with increased treble damages under 35 U.S.C. § 284.

172.    BD willfully infringes the '526 patent. At least as early as the filing and service of these Counterclaims, BD has been on actual notice of the '526 patent. Upon information and belief, BD continues to deliberately and intentionally infringe the '526 patent. BD knew or should have known that its actions would cause infringement of the '526 Patent, yet BD continues to infringe the '526 patent.

173.    This is an exceptional case warranting an award of treble damages to Oxylabs under 35 U.S.C. § 284, and an award of Oxylabs' attorney's fees under 35 U.S.C. § 285.

## COUNT IV
### (INFRINGEMENT OF OXYLABS' '667 PATENT)

174. Oxylabs incorporates the foregoing paragraphs by reference as if fully set forth herein.

175. A true and accurate copy of the '667 patent is attached hereto as Exhibit 2.

176. All claims of the '667 patent are valid and enforceable, and each enjoys a statutory presumption of validity under 35 U.S.C. § 282.

177. Oxylabs is the sole owner of the '667 patent and has rights to past damages.

178. Independent claim 1 of the '667 patent recites:

1. A computer-implemented method of selectively retrieving data from a source file on a public network and automatically collecting retrieved data in a target database, comprising:

initializing a data retrieval stage by:

selecting the source file;

parsing selected data elements in the source file into a list of data elements;

selecting at least one of the data elements from the list to be stored in the target database;

identifying source locations of the selected at least one of the data elements;

selecting the target database and target locations in the target database where the at least one of the data elements is to be stored in the target database;

saving the source locations and target locations of the at least one of the parsed data elements in a location file in the target database;

setting a schedule frequency for transferring the at least one of the parsed data elements from the source locations to the target locations in the location file in the target database; and

automatically, selectively parsing new data elements corresponding to the at least one of the parsed data elements

previously selected during the initialization of the data retrieval stage, pursuant to the schedule frequency, by transferring the selectively parsed new data elements from the saved source locations in the source file to the saved target locations in the target database.

179. As described above, BD has infringed (both literally and/or under the doctrine of equivalents) and/or induced infringement of the '667 patent by designing, manufacturing, making, using, providing, importing into the United States, selling and/or offering for sale in the United States, or by intending that others perform such acts, products and/or methods covered by at least claim 1 of the '667 patent, including but not limited to the Accused Web Scraper IDE Product.

180. As described above, BD designs, manufactures, makes, uses, provides, imports into the United States, sells and/or offers for sale in the United States the Accused Web Scraper IDE Product and thus directly infringes (both literally and/or under the doctrine of equivalents) the '667 patent.

181. As described above, the Accused Web Scraper IDE Product selectively retrieves data from source files and automatically collects retrieved data in target databases. The Accused Web Scraper IDE Product initializes a data retrieval stage by selecting source files, parsing selected data elements in the source file into a list of data elements, selecting data elements from the list to be stored in the target database, identifying source locations of the selected data elements, and selecting the target database and target locations in the target database where the at least one of the data elements is to be stored in the target database, and setting a schedule frequency for transferring the parsed data elements from the source locations to the target locations in the location file in the target database. Upon information and belief, the Accused Web Scraper IDE Product saves the source locations and target locations of the parsed data elements in a location file in the target database. The Accused Web Scraper IDE Product automatically and selectively parses new data elements corresponding to the parsed data elements previously selected during the

initialization of the data retrieval state, pursuant to the schedule frequency, by transferring the selectively parsed new data elements from the saved source locations in the source file to the saved target locations in the target database. As also described above, BD performs each of these steps when it uses the Accused Web Scraper IDE to update datasets within its Datasets product.

182. BD also indirectly infringes the '667 patent. As explained above, at least as early as the filing and service of these Counterclaims, BD has been on actual notice of the '667 patent. Additionally, BD knows, at least from these Counterclaims, that the Accused Web Scraper IDE Product practices the steps of at least claim 1 of the '667 patent. Upon information and belief, BD also received actual notice of the '667 patent when it reviewed Oxylabs website at https://oxylabs.io/legal/oxylabs-patents.

183. BD indirectly infringes the '667 patent by inducing infringement by others, such as BD's customers that use the Accused Web Scraper IDE Product, in this District and elsewhere in the United States. For example, BD's customers directly infringe at least claim 1 of the '667 patent when they use the Accused Web Scraper IDE Product as intended and instructed by BD. As explained above, BD instructs its customers (and potential customers) regarding how to use the Accused Web Scraper IDE Product (including how to create and use custom data collectors via BD's Web Scraper IDE). Such instructions include BD's website and blogs discussing the Accused Web Scraper IDE Product (Exs. 16-18; Ex. 39; Ex. 42), BD's Data Collector Start Guide (Ex. 19), BD's FAQ/help website discussing the Web Scraper IDE (what it is and how to use it) (Exs. 20-33; Exs. 35-38; Exs. 40-41), and BD's YouTube channel (https://www.youtube.com/channel/UCM_0cG1ljAoEUcZIyoUIq6g), including videos on that channel discussing the Web Scraper IDE and related proxy network(s) (e.g., residential, data center, etc.) (*see, e.g.*, BD videos

at https://www.youtube.com/watch?v=q8kFe5MPAC0&t=424s and https://www.youtube.com/watch?v=Kh-22LVgUTw).

184. As a result of BD's infringement of the '667 patent, Oxylabs has suffered and continues to suffer damages. Thus, Oxylabs is entitled to recover from BD the damages that Oxylabs sustained (and continues to sustain) as a result of BD's wrongful and infringing acts in an amount no less than Oxylabs' lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court together with increased treble damages under 35 U.S.C. § 284.

185. BD willfully infringes the '667 patent. At least as early as the filing and service of these Counterclaims, BD has been on actual notice of the '667 patent. Upon information and belief, BD continues to deliberately and intentionally infringe the '667 patent. BD knew or should have known that its actions would cause infringement of the '667 patent, yet BD continues to infringe the '667 patent.

186. This is an exceptional case warranting an award of treble damages to Oxylabs under 35 U.S.C. § 284, and an award of Oxylabs' attorney's fees under 35 U.S.C. § 285.

## JURY DEMAND (COUNTERCLAIMS)

187. Oxylabs demands, pursuant to Federal Rule of Civil Procedure 38, a trial by jury on all issues so triable.

## PRAYER FOR RELIEF (COUNTERCLAIMS)

188. Oxylabs requests that the Court enter a judgment in Oxylabs' favor as follows:

A. Dismissing BD's Counterclaim in its entirety, with prejudice;

B. Finding that BD is not entitled to any relief, whether in law or equity or otherwise, from its suit against Oxylabs;

C. Finding that Oxylabs does not infringe and has not infringed the '317 patent;

D.    Finding that the claims of the '317 patent are invalid, unenforceable and/or not eligible for patent protection;

E.    Finding that Oxylabs is entitled to prevail on all of its defenses, affirmative defenses, and counterclaims;

F.    Permanently enjoining BD, its successors and assigns, and anyone acting in concert therewith or on their behalf, from attempting to enforce the '317 patent against Oxylabs or any parents, affiliates, or subsidiaries of Oxylabs or any of their respective officers, agents, employees, successors, and assigns;

G.    Adjudging that BD has and is infringing Oxylabs' Asserted Patents;

H.    Adjudging that BD's infringement of Oxylabs' Asserted Patents has been willful;

I.    Awarding Oxylabs damages in an amount adequate to compensate Oxylabs for BD's infringement of Oxylabs' Asserted Patents, but in no event less than the greater of Oxylabs' lost profits and/or a reasonable royalty under 35 U.S.C. § 284;

J.    Awarding enhanced damages pursuant to 35 U.S.C. § 284;

K.    Declaring that this is an exceptional case in Oxylabs' favor pursuant to 35 U.S.C. § 285;

L.    Awarding Oxylabs its costs, expenses, and reasonable attorney's fees, whether pursuant to 35 U.S.C. § 285 or otherwise;

M.    Awarding pre-judgment and post-judgment interest on the damages awarded to Oxylabs at the highest rate allowed by law;

41

N.   Ordering an accounting of all damages; and

O.   Entering an Order that Oxylabs shall have and recover from BD any and all such other and further relief, general and special, at law or in equity, to which Oxylabs may be justly entitled.

Dated: April 28, 2023

Respectfully submitted,

BRETT C. GOVETT
  Texas State Bar No. 08235900
  brett.govett@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone: (214) 855-8000
Telecopier: (214) 855-8200

DANIEL S. LEVENTHAL
  Texas State Bar No. 24050923
  daniel.leventhal@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
Telecopier: (713) 651-5246

MICHAEL C. SMITH
  Texas State Bar No. 18650410
  michael.smith@solidcounsel.com
**SCHEEF & STONE, LLP**
113 East Austin Street
Marshall, Texas 75670
Telephone: (903) 938-8900
Telecopier: (972) 767-4620

STEVEN CALLAHAN
  Texas State Bar No. 24053122
  scallahan@ccrglaw.com
CHRISTOPHER BOVENKAMP
  Texas State Bar No. 24006877
  cbovenkamp@ccrglaw.com
CRAIG TOLLIVER
  Texas State Bar No. 24028049
  ctolliver@ccrglaw.com
GEORGE T. "JORDE" SCOTT
  Texas State Bar No. 24061276
  jscott@ccrglaw.com
MITCHELL SIBLEY
  Texas State Bar No. 24073097
  msibley@ccrglaw.com
JOHN HEUTON
  *Pro Hac Vice* to be applied for
  jheuton@ccrglaw.com
**CHARHON CALLAHAN
ROBSON & GARZA, PLLC**
3333 Lee Parkway, Suite 460
Dallas, Texas 75219
Telephone: (214) 521-6400
Telecopier: (214) 764-8392

*Counsel for Defendant and
Counterclaim Plaintiff Oxylabs, UAB*

43

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on April 28, 2023. As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A).

STEVEN CALLAHAN