**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| BRIGHT DATA LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 2:23-CV-00171-JRG-RSP |
| | § | |
| OXYLABS, UAB., | § | |
| | § | |
| Defendant. | § | |

# CLAIM CONSTRUCTION ORDER

In this patent case, both parties assert patent-infringement causes of action. Bright Data Ltd. alleges infringement by Oxylabs, UAB., of claims from U.S. Patent 11,206,317, which relates "to improving data communication speed and bandwidth efficiency on the Internet." '317 Patent at 1:24–25. Oxylabs counterclaims for infringement of claims from U.S. Patents 7,010,526 and 7,020,667, which relate to data mining. First Am. Answer, Dkt. No. 58 at 34–40; *see also* '526 Patent at 1:6–7 ("The present invention relates generally to data mining systems."); '667 Patent at 1:11–15 (noting the invention pertains to "parsing a Web page source file, collecting the specified data on the Web page, automatically retrieving the specified data on a predetermined frequency or scheduled time, and then storing the collected data in a database structure").

The parties dispute the scope of 15 terms or phrases from the three patents. Having considered the parties' briefing and arguments of counsel during a June 25, 2024 hearing, the Court resolves the disputes as follows.

# I. BACKGROUND

## A. U.S. Patent 11,206,317

The ’317 Patent concerns “improving data communication speed and bandwidth efficiency on the Internet.” ’317 Patent at 1:24–25. The patent explains how, as Internet bandwidth consumption continues to increase, users experience slower speeds, content owners pay more for hosting and bandwidth costs, and Internet service providers incur higher infrastructure costs. *Id.* at 1:42–53.

The patent describes two prior-art attempts to address these problems. Some systems use “proxy servers” located logically between client devices and web servers. The proxy servers request content from various web servers and store, or “cache,” that content for future use by other client devices that request the same content. This speeds access to the data for devices that are geographically close to a proxy server, provided that proxy server has the necessary storage space and bandwidth for all of the content likely to be requested. *See generally* ’317 Patent at 2:8–23.

The patent, however, cautions against using proxy servers for large-scale (e.g., global) solutions because they have insufficient storage for all of the data available on the Internet. Such implementations would require an extensive capital investment, and proxy servers are poorly suited for dynamic data.[1] *Id.* at 2:24–39.

As an alternative to proxy servers, the patent describes peer-to-peer file sharing, a process by which files are stored on many computers accessible through the Internet. This provides multiple sources for files and therefore speeds access to those files. *See generally* ’317 Patent at 2:40–

[1] “Dynamic data” does not exist until created in response to the request of a client device. ’317 Patent at 1:65–2:5.

52. This approach, however, requires a file index tracking the location of all shared content. *Id.* at 2:52–58. While this works well for files in relatively low demand, the cost of storing and maintaining a large index for all available Internet content is cost-prohibitive. *See id.* at 2:59–3:1 (noting the cost of storing an index for all files on the Internet would be billions of dollars). And as with proxy servers, peer-to-peer file sharing does not effectively address the use of dynamic data. *Id.* at 3:1–3.

The patent addresses these problems with a system that, relative to the prior art, "provides for faster and more efficient data communication within a communication network." *Id.* at 3:14–16. Specifically, the patents describe a system in which a client device intercepts communication requests (e.g., a web request for content) to a server from requesting applications (e.g., web browsers). The client device transmits intercepted requests to an acceleration server, which returns a list of agents associated with the targeted server's IP address. The request is sent to these agents, which respond with a list of peers that have previously seen some or all of the requested content. The client then downloads the data from these peers rather than the server, which speeds up file transfer, reduces congestion by fetching content from multiple sources, and offloads data transfers from web servers to nearby peers. '317 Patent at [57].

Claim 1 recites:

> 1. A method for fetching, by a first device, a first web-page that is identified by a first Uniform Resource Locator (URL) and is stored in a first web server and a second web-page that is identified by a second URL and is stored in a second web server, for use with a second device that stores a group of Internet Protocol (IP) addresses, each of the IP addresses is associated with a respective geographical location, the method comprising:
>
> **identifying, at the first device, the first URL and a first geographical location that is associated with at least one of**

> **the IP addresses in the group**;
>
> sending, by the first device to the second device, the first URL and the first geographical location;
>
> receiving, by the first device from the second device, the first web-page, in response to the sending of the first URL and the first geographical location;
>
> **identifying, at the first device, the second URL and a second geographical location that is associated with at least one of the IP addresses in the group**;
>
> sending, by the first device to the second device, the second URL and the second geographical location; and
>
> receiving, by the first device from the second device, the second web-page, in response to the sending of the second URL and the second geographical location.

’317 Patent at 19:18–41 (disputed terms in bold). The parties’ only dispute from this patent relates to the two “identifying” steps.

### B. U.S. Patent 7,010,526

The ’526 Patent relates to data mining large amounts of information. Using then-existing[2] search engines as an example, the patent explains that Web crawling generates an index of words on Web pages that correlates words with the URLs in which those words appear. When a user runs a search, the engine returns links based on “relevance,” which often means key-word frequency. But because such an approach misses context, human experts must still “winnow out” search results, which is labor intensive. *See generally* ’526 Patent at 1:11–45.

To address this inefficient use of resources, the patent teaches using “cascading expert rules to sift through a large body of information.” ’526 Patent at 2:4–6. For example, Figure 2 (below) shows a set of “low-level miners” that process data from a data store and write the results back

[2] The patent issued in 2006. ’526 Patent at [45]

(step 64). After receiving a customer data requirement (step 66), more specific miners can address the customer's request (step 68). These "high level miners" specify dependencies on the output of the lower level miners. *See generally id.* at 8:13–56.




*FIG. 2*
*OVERALL FLOW*

Most of the terms at issue from this patent are in Claims 1–2. Claim 1 recites:

> 1. A method for data mining, comprising:
>
> crawling the Internet to return Web pages to a data store;
>
> accessing the data store with at least a first data miner to process data in the store and output at least one result;
>
> receiving a customer request for information;
>
> **creating at least a second data miner in response to the customer request for information**, the second data miner accessing at least the result of the first data miner to generate an output; and
>
> at least partially based on the output of the second data miner, responding to the customer request for information.

'526 Patent at 11:63–12:7 (disputed terms in bold). Claim 2 adds the step of "billing the customer for responding to the customer request for information," *id.* at 12:8–9, the scope of which is also disputed.

### C. U.S. Patent at 7,020,667

The '667 Patent relates to "[t]ransferring data found on websites to a database format [to] allow significant data management and manipulation capabilities." '667 Patent at 1:31–33. Although there were prior-art systems for performing such a function, the patent characterizes them as inefficient, labor intensive, and error-prone when done on a regular basis, such as the "regular recording of stock prices." *Id.* at 1:34–44; *see also id.* at 1:45–52 (noting some systems "do not provide a mechanism for parsing individual data elements, replicating that data in a relational database format, or automatic data collection in a manner specified by the user").

The patent purports to teach a system "able to retrieve Internet data automatically and to assign that data to appropriate places in a database structure defined by the user." '667 Patent at 1:67–2:2. For frequently changing data—the patent uses stock prices and weather information as examples—the system automatically retrieves data based on a user-defined schedule. *Id.* at 2:2–4; *see also id.* at 1:26–30 (suggesting the possible utility of weather information and stock quotes "beyond simply viewing that data in the form and location as it is displayed on the Internet").

The disputed terms are in Claim 1, which divides its method steps into an "initialization stage" and an "automatic-execution stage." Specifically, Claim 1 recites:

> 1. A computer-implemented method of selectively retrieving data from a **source file** on a public network and automatically collecting retrieved data in a target database, comprising:
>
> initializing a data retrieval stage by:
>
> selecting the **source file**;
>
> **parsing selected data elements in the source file into a list of data elements**;
>
> selecting at least one of the data elements from the list to be stored in the target database;
>
> **identifying source locations of the selected at least one of**

**the data elements**;

selecting the target database and **target locations** in the target database where the at least one of the data elements is to be stored in the target database;

saving the **source locations** and **target locations** of the at least one of the parsed data elements in a **location file** in the target database;

setting a schedule frequency for transferring the at least one of the parsed data elements from the **source locations** to the **target locations** in the **location file** in the target database; and

automatically, selectively parsing new data elements corresponding to the at least one of the parsed data elements previously selected during the initialization of the data retrieval stage, pursuant to the schedule frequency, by **transferring the selectively parsed new data elements from the saved source locations in the source file to the saved target locations in the target database**.

’667 Patent at 6:63–7:24 (disputed terms in bold).

## II. LEGAL STANDARDS

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to

explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the

prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

### A. Generally

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill in the art is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

### B. The '317 Patent

For the '317 Patent, Bright characterizes a skilled artisan as one who, on the effective filing date, "had a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet communications." Dkt. No. 67 at 12 (citing Williams Decl., Dkt. No. 67-2 ¶ 19). Oxylabs does not oppose that characterization, Dkt. No. 75 at 10, which the Court adopts.

### C. The '526 Patent and '667 Patent

Oxylabs proposes a skilled artisan "would have at least a Bachelor's Degree in Computer Science or related field (or equivalent experience), as well as two or more years of experience working with and programming networked computer systems." Dkt. No. 68 at 3 (quoting Almeroth Decl., Dkt. No. 68-1 ¶ 30). "Such a person," says Oxylabs, "would be familiar with the

underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks." *Id.* Bright proposes a skilled artisan would have "had either: (1) a Bachelor's Degree or higher in the field of electrical engineering, computer engineering, or computer science and at least one year of related practical experience; or (2) at least four years of practical experience in data management." Dkt. No. 74 at 4–5 (citing Williams Decl., Dkt. No. 74-2 ¶ 20). The Court views these proposals as equivalent for the purpose of resolving the present disputes and notes neither party suggests the proper constructions turn on which level of skill the Court adopts.

## IV. THE DISPUTED TERMS

### A. "identifying, at the first device, the [first/second] URL and a [first/second] geographical location that is associated with at least one of the IP addresses in the group" ('317 Patent, Claim 1)

| Bright's Construction | Oxylabs's Construction |
| --- | --- |
| "identifying, at the first device, the [first/second] URL and a [first/second] geographical location that is associated with at least one of the IP addresses in the group (not simply the IP address of the first device)" | Plain and ordinary meaning |

The parties' dispute revolves around the phrase "geographical location that is associated with at least one of the IP addresses." Bright is concerned, based on Oxylabs's invalidity contentions, that Oxylabs reads "geographical location" and "IP address" interchangeably. Dkt. No. 77 at 2. Moreover, in Bright's view, "Oxylabs asserts that the first device could satisfy the 'identifying' step by merely having an IP address, because the first device would necessarily send its own IP address as part of any communication to the second device and the second device could derive a geographical local from the first device's IP address." Dkt. No. 67 at 16.

Oxylabs denies it makes these assertions and accuses Bright of misunderstanding its invalidity contentions. Dkt. No. 75 at 11. In fact, Oxylabs acknowledges "a geographical location and

an IP address are different," *id.* at 13–14, and that the claims do not preclude the first device from sending its own geographical location, *id.* at 16. Oxylabs accuses Bright of "attempt[ing] to construe the claims as requiring the IP addresses in the group to be proxy IP addresses and the geographical location to be that of a desired proxy IP address," *id.* at 17, which Bright denies, Dkt. No. 77 at 3–4.

Ultimately, the Court struggles to find any disagreement about claim scope between the parties. Appearing to recognize as much, Bright argues the Court should adopt its proposed construction to prevent Oxylabs from later taking a contrary position. Dkt. No. 77 at 16. But if there is no disagreement between the parties, there is nothing to construe. *See U.S. Surgical Corp.*, 103 F.3d at 1568 (noting "[c]laim construction is a matter of [resolving] *disputed* meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims" (emphasis added)). Regardless, should a party later take a contrary position to its earlier briefing, the Court can address that in other ways. Because of the lack of a dispute about this term's meaning, the Court will give this phrase a "plain and ordinary meaning" construction.

### B. "data miner" ('526 Patent, Claims 1, 6, 19)

| Bright's Construction | Oxylabs's Construction |
| --- | --- |
| "software-implemented analysis engine" | Plain and ordinary meaning |

In their briefing, the parties dispute whether a "data miner" must be software. For its contention that a data miner can be hardware, Oxylabs points to Figures 1, 3, and 7 of the patent, which show a system including both software and hardware. Dkt. No. 68 at 5. Bright, however, argues lexicography and points to the patent's explanation that a data miner is an "analysis engine," which is software. Dkt. No. 74 at 5–6 (citing '526 Patent at 2:29–32, 5:47–50).

At the hearing, however, the focus of the dispute shifted. Bright explained its concern was

ensuring "data miner" was construed as having an "analysis" component rather than as something that simply crawls the internet and obtains information. *See* Hr'g Tr., Dkt. No. 90 at 14:13–16 ("[B]y saying what it is, analysis engine, you need to know it does more than crawl and obtain information, it has to analyze it."); *see also id.* at 14:22–25 (indicating whether the "data miner" must be "software-implemented" is not an issue). Oxylabs countered that construing the term as an "analysis engine" might unfairly limit the scope of the term based on the specification. *Id.* at 18:2–10. It agreed, however, that "a data miner does have to perform analysis." *Id.* at 18:17.

Based on the parties' positions at the hearing, the Court rejects Bright's argument about lexicography. Both parties agree that a "data miner" of the claims must perform some analysis. Thus, Bright does not show how construing "data miner" as "analysis engine" changes the scope of the term. Moreover, adopting Bright's construction would simply be substituting "analysis engine" for "data miner" with no explanation of what other structural limitations that might inject into the claims. For example, the specification generally explains "data miners" are "modular," "have specific input and output specifications," "may be written in any language," and may be very large or very small. '526 Patent at 6:25–30. Bright does not explain whether an "analysis engine" is consistent with this explanation, or perhaps narrower than it.

Ultimately, Bright's goal in construing "data miner" as "analysis engine" is that there be some "analysis" by the data miner that is more than just "crawling the web." The parties agree that's a requirement, which resolves the dispute. Accordingly, the Court will give this term a "plain and ordinary meaning" construction.

### C. "process data" ('526 Patent, Claim 1)

| Bright's Construction | Oxylabs's Construction |
|---|---|
| "analyze information" | Plain and ordinary meaning |

Claim 1 requires "accessing [a] data store with at least a first data miner to *process data* in the store and output at least one result[.]" '526 Patent at 11:65–66 (emphasis added). Bright asserts the Court must construe this term to prevent Oxylabs from claiming it means "virtually anything." Dkt. No. 74 at 6. As an example, says Bright, "Oxylabs does not explain if it understands 'process[ing]' to simply require copying data in the data store—a construction that would be prohibited as contrary to the claims and specification." *Id.* (brackets in original).

Oxylabs, however, characterizes Bright's construction as "potentially narrower" than the ordinary meaning of the term. Dkt. No. 68 at 6. "Nowhere," stresses Oxylabs, "does the patentee draw a distinction between the words 'process' and 'analyze' (or 'data' and 'information')." *Id.* at 7. Addressing Bright's question about copying, Oxylabs replies it does not assert "processing" requires no more than copying data in the data store. Dkt. No. 78 at 2.

Oxylabs has the better position for two reasons. First, Bright has not shown a crystallized dispute between the parties about the scope of the disputed term. At most, Bright presents a *possible* dispute, which Oxylabs resolved in its reply. Second, even if there were a crystallized dispute to resolve, Bright has not shown that the scope of "data" and "information" or ("process" and "analyze") is the same or, if it is not, the legal justification for deviating from the claim language's ordinary meaning. Given that, the Court rejects Bright's position and will give this term a "plain and ordinary meaning" construction.

**D. "creating" ('526 Patent, Claims 1, 3)**

| Bright's Construction | Oxylabs's Construction |
| --- | --- |
| "bringing into existence something that had not been written" | Plain and ordinary meaning. |

This dispute concerns prosecution-history disclaimer. Bright accuses Oxylabs of

attempting to expand the scope of "creating" "to include data miners that were already written or pre-existing." Dkt. No. 74 at 7. It points to the applicants' amendment to the claims to replace "establishing" with "creating," and their related arguments that a cited reference disclosed passing requests for data to a *pre-existing* search engine. *Id.* at 8. Bright also notes that, during an IPR proceeding, Oxylabs argued "predefined queries" are not the "creation" of a data miner, and providing results to a user based on customized parameters of a search request does not meet the "creating" limitation. *Id.* at 9–10.

Oxylabs denies it is attempting to broaden the scope of "creating." Dkt. No. 78 at 3 (noting the parties' agreement that "'creating' a second data miner requires 'the generation of a new miner'"). Instead, it frames the dispute as whether "creating" a "data miner" can only be done by writing, as implied by Bright's construction. *Id.*

The Court agrees with Oxylabs, because it sees no disclaimer that narrows the ordinary meaning of "creating." Rather, the prosecution history to which Bright points simply applies that ordinary meaning. Ultimately, Bright seeks clarity that (1) creating a copy of an existing miner is not "creating at least a second data miner" as recited by Claim 1, and (2) the provision of customized parameters does not meet the "creating" limitation. At the hearing, Oxylabs agreed with both propositions. *See* Hr'g Tr., Dkt. No. 90 at 38:13–39:2. With that agreement noted, the Court will give this term a "plain and ordinary meaning" construction.

### E. "second data miner" ('526 Patent, Claim 1)

| Bright's Construction | Oxylabs's Construction |
|---|---|
| "a different data miner than the first data miner" | Plain and ordinary meaning. |

There appears to be no dispute between the parties as to the scope of this term. Oxylabs calls Bright's construction "at best duplicative and unnecessary." Dkt. No. 68 at 8. Bright argues a

construction would clarify that the second data miner is necessarily a different data miner than the first. Dkt. No. 74 at 11. That, however, is evident from the modifiers "first" and "second" and the claim's requirement that the second miner is created during implementation of the method. *See Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention." (quoting *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004)). Accordingly, the Court sees little to no potential for jury confusion and opts to give this term a "plain and ordinary meaning" construction.

### F. "billing the customer for responding to the customer request for information" ('526 Patent, Claim 1)

| Bright's Construction | Oxylabs's Construction |
|---|---|
| "billing the customer for responding to the customer request for information on a per request basis rather than a subscription basis" | Plain and ordinary meaning |

Bright argues Oxylabs disclaimed billing on a subscription basis during prosecution. Bright specifically points to arguments made to overcome Jamarillo, where Oxylabs distinguished that reference as "bill[ing] only by subscription, not by query." Dkt. No. 74 at 12 (quoting Appeal Br., Dkt. No. 74-5 at 14). According to Bright, "Oxylabs improperly seeks to include predetermined subscription billing if the subscription includes overage charges or discounts on a per request basis." *Id.* at 12–13.

Oxylabs agrees that pure flat-fee billing, without more, falls outside the scope of this limitation, but notes the statement to which Bright points references "*only* by subscription." Dkt. No. 68 at 10. Thus, it says, it would be improper to expand the scope of disclaimer to a billing type just because it includes a subscription component. *See* Dkt. No. 78 at 4.

The Court agrees with Oxylabs. Bright presents no evidence Oxylabs disclaimed embodiments in which only *some* billing occurred on a per-request basis. Accordingly, the Court holds there is no such disclaimer and will construe this term as "billing the customer, other than billing only by subscription, not by query, for responding to the customer request for information."

**G. "entity" ('526 Patent, Claims 6, 16)**

| Bright's Construction | Oxylabs's Construction |
|---|---|
| "entry in the data store representing a Web page, hyperlink, person, corporation, article, demographic group or geographic region"<br>Alternatively, indefinite. | Plain and ordinary meaning |

Bright argues "entity" must be "construed according to the disclosure in the specification," which limits the term's scope to specific listed examples. Dkt. No. 74 at 13–14. Oxylabs counters that the specification and claims uniformly provide context sufficient to understand the term's scope. Dkt. No. 68 at 12.

The Court agrees with Oxylabs. As an initial matter, neither Bright nor Oxylabs makes any attempt to discern an "ordinary and customary meaning" of the term. "Entity," however, is a well-known programming and database term, the meaning of which the Court adopts: "something about which information or data can be stored in a database" *See entity*, https://www.yourdictionary.com/entity ("(computing) Anything about which information or data can be stored in a database; in particular, an organised array or set of individual elements or parts").

**H. "source file" ('667 Patent, Claims 1, 4)**

| Bright's Construction | Oxylabs's Construction |
|---|---|
| "HTML file for the web page" | Plain and ordinary meaning |

The parties dispute whether "source file" must be limited to an HTML file. According to

Oxylabs, not only is the ordinary meaning of the phrase not so limited, but the intrinsic evidence makes clear that a "source file" may be one of many different types. Dkt. No. 68 at 16. Bright, however, argues the specification clearly defines "source file" as an HTML file, pointing to Figure 4 and stressing the specification's repeated references to "HTML source file." Dkt. No. 74 at 18.

The Court sees no lexicography or disavowal on this record. Bright's best argument for disavowal is in the Summary, which explains "[t]he automatic execution stage automatically transfers the data from the HTML source file to the target database." '667 Patent at 2:38–40. But the Summary earlier refers to html source code as exemplary. *See id.* at 2:11–14 ("The system and method . . . allow the capture and replication of data presented at various Web pages into a database application through text parsing of, *for example*, the HTML source code of the retrieved documents." (emphasis added)). And while Bright stresses the specification only discloses the use of HTML source files, that alone does not justify deviation from the term's ordinary meaning. The Court therefore holds "source file" should be given its "plain and ordinary meaning," which is not limited to HTML source files.

### I. "parsing selected data elements in the source file into a list of data elements" ('667 Patent, Claim 1)

| Bright's Construction | Oxylabs's Construction |
|---|---|
| "processing the selected web page to create a list of identifiable data elements" | Plain and ordinary meaning |

Bright again accuses Oxylabs of planning to improperly expand the scope of the phrase. It argues its construction is necessary to aid the jury in understanding the invention. Dkt. No. 74 at 19. Oxylabs, however, lodges three objections to Bright's construction: (1) the meaning of "parsing" is clear; (2) "data elements" is not synonymous with "web page"; and (3) Bright wrongly inserts "identifiable" into the claim language. Dkt. No. 68 at 18.

At the hearing, Bright only focused on whether the data elements must be "identifiable." It argued that unless that's true the step of "selecting at least one of the data elements" cannot happen. Hr'g Tr., Dkt. No. 90 at 52:17–23, 54:21–25 (arguing "you have to break the page or file down into identifiable units . . . so that the selection can occur"). Bright's concern is that Oxylabs might claim running a search on the whole web page meets the "parsing" limitation. *Id.* at 55:8–11. Thus, Bright seeks to make clear one must perform the parsing step before the selection step. *Id.* at 71:1–5.

Bright, however, fails to identify any dispute about scope concerning the phrase, or explain any risk of significant juror confusion. While it says the data elements in the list must be "identifiable" or the "selection" step cannot occur, that does not necessitate a rewrite of straightforward claim language. Rather, that argument is best left to later the "infringement" or "validity" stage of the proceeding. Accordingly, the Court will give this term a "plain and ordinary meaning" construction.

### J. "source locations" ('667 Patent, Claims 1); "identifying source locations of the selected at least one of the data elements" ('667 Patent, Claims 1)

| Bright's Construction | Oxylabs's Construction |
|---|---|
| **"source locations":** "locations of the selected data element(s) in the list"<br>**"identifying source locations of the selected at least one of the data elements":** "identifying the locations in the list of data elements corresponding to the selected data elements" | Plain and ordinary meaning |

The parties dispute whether "source location," which appears only in the claims, refers to the location of the data elements in the source file (as urged by Oxylabs) or the location of data elements resulting from the "parsing" step. Oxylabs urges the former based on the claim language, Dkt. No. 68 at 16–18, whereas Bright points to the prosecution history and specification for

support, Dkt. No. 74 at 22–25.

The patent concerns transferring website data to a database format to allow "significant data management and manipulation capabilities afforded through standard database software." '667 Patent at 1:32–33. To that end, the patent discloses downloading a webpage source file, parsing the file, and placing the data into an array. "The purpose of the parsing is to isolate potentially usable data and to describe *how to subsequently locate this data in the Web page source.*" *Id.* at 4:63–66 (emphasis added). The system can then automatically retrieve a new source file from the web server and know where within that source file to find the desired data.

220




**FIG. 6**

As an example, Figure 6 (above) shows "an exemplary webpage 220 from which a user wishes to transcribe data." '667 Patent at 5:66–67. "The data the user wants to collect and retrieve is shown . . . at locations 605 and 610." *Id.* at 5:67–6:2. After the data is stored in a database, "[t]he user then specifies the times data should be transferred from the web page to the database." *Id.* at 6:45–47. Thus, once the "source locations" of the data in the webpage are identified, the system can periodically update the database with the data at that location.

The Court agrees with Oxylabs. Most persuasively, Claim 1's language supports Oxylab's position. In the automatic-execution stage, the claim requires the transfer of data "from the saved *source locations in the source file* to the saved target locations in the target database." '667 Patent at 7:22–24 (emphasis added). Not only does that support Oxylabs's position, but it aligns with the prosecution-history remarks to which Bright points, in which the applicants characterized Claim 1 as transferring "new selectively parsed data elements *from the source locations that were identified and saved* in the initialization stage to the target locations that were also saved in the initialization stage." Partial File Wrapper, Dkt. No. 74-12 at OXY0000575 (emphasis added). That the "source locations" are first "identified" and then "saved" shows they exist prior to being written to the location file, which undercuts Bright's position.

Bright also points to the specification and, more specifically, the statement that "[s]ystem 10 remembers the location of the data in the array 330 and retrieves data from the same locations on each successive data transfer." Dkt. No. 74 at 23 (quoting '667 Patent at 4:56–5:17). According to Bright, this means "[t]he array locations file allows the system to remember the location of data in the array (source location) enabling the system to successively transfer this data to the appropriate location in the target database (target location)." *Id.*

Bright, however, misinterprets the statement, which simply means the system remembers the location *in the source file* of the data already stored in the array. Interpreting "source location" otherwise would obviate the need for separate "initialization" and "automatic execution" stages as recited in Claim 1.

In short, the claims, prosecution history, and specification all support Oxylabs's position. Accordingly, the Court rejects Bright's construction and construes (1) "source location(s)" as "location(s) of data elements in the source file"; and (2) "identifying source locations of the selected

at least one of the data elements" as "identifying the locations in the source file of the selected data elements."

**K. "target locations" ('667 Patent, Claim 1)**

| Bright's Construction | Oxylabs's Construction |
|---|---|
| "location(s) in the target database for storing the data from the source location(s)" | Plain and ordinary meaning |

Oxylabs appears to agree with Bright's construction, but calls it either unnecessary or an attempt to add some unclear limitation. Dkt. No. 68 at 20. But according to Bright, "Oxylabs again improperly requests a plain and ordinary meaning construction that disregards the disclosure in the underlying specification." Dkt. No. 74 at 25.

The Court sees no dispute to resolve. For one, Bright does not explain how Oxylabs's position "disregards the disclosure in the underlying construction." Moreover, the claim language itself explains the target location is the location where the data elements are stored. *See* '667 Patent at 7:8–10 (reciting the step of "selecting . . . target locations in the target database where the at least one of the data elements is to be stored in the target database"). That aligns with both Bright's construction and Oxylabs's position. Because the parties agree on the scope of this term, the Court will assign it a "plain and ordinary meaning" construction.

**L. "location file" ('667 Patent, Claim 1)**

| Bright's Construction | Oxylabs's Construction |
|---|---|
| "file for mapping the source location(s) and corresponding target location(s)" | Plain and ordinary meaning |

This dispute centers on the relationship, if any, required between the source and target locations in the location file. More specifically, it concerns Bright's inclusion of "mapping" in its

construction. Bright chose that word based on the specification, which it says "describes the mapping of data elements." Dkt. No. 74 at 27. Bright's expert, Dr. Tim Williams, asserts a skilled artisan "would not be able to understand what the 'location field' [is] if a location file does not map source locations and corresponding target locations for the selected elements." *Id.* at 28 (quoting Williams Decl., Dkt. No. 74-1 ¶ 116).

But nothing in the intrinsic record *requires* "mapping." More broadly, nothing about "location file" inherently requires a relationship between the source locations and the target locations within the file. Bright simply imports that requirement from the specification's description of the preferred embodiment.

Moreover, the Court disagrees with Dr. Williams's conclusion that a skilled artisan would not understand the scope of "location file." There is no dispute as to the meaning of "file," and "location" is simply a modifier. Based on the claim language, the location file need be nothing more than a file into which the source locations and target locations are saved. Accordingly, the Court rejects Bright's position and will give this term a "plain and ordinary meaning" construction.[3]

### M. "transferring the selectively parsed new data elements from the saved source locations in the source file to the saved target locations in the target database" ('667 Patent, Claim 1)

| Bright's Construction | Oxylabs's Construction |
|---|---|
| "storing data from the source location(s) in the new list to the corresponding target location(s)" | Plain and ordinary meaning |

Oxylabs characterizes this final dispute as "a repeat of issues raised in connection with

[3] At the hearing, Bright indicated it was "okay" with a "plain and ordinary meaning" construction for this term. Hr'g Tr., Dkt. No. 90 at 73:4–5.

other claim terms." Dkt. No. 68 at 21. It calls Bright's construction erroneous for two reasons: (1) it ties "source location" to lists rather than source files; and (2) it requires a relationship between the source locations and the target locations. Because the Court has previously decided Oxylabs's position is more proper for both of those issues, the Court rejects Bright's position and will give this term a "plain and ordinary meaning" construction.[4]

## V. CONCLUSION

| Disputed Term | The Court's Construction |
| --- | --- |
| "identifying, at the first device, the [first/second] URL and a [first/second] geographical location that is associated with at least one of the IP addresses in the group"<br>('317 Patent, Claim 1) | Plain and ordinary meaning |
| "data miner"<br>('526 Patent, Claims 1, 6, 19) | Plain and ordinary meaning |
| "process data"<br>('526 Patent, Claim 1) | Plain and ordinary meaning |
| "creating"<br>('526 Patent, Claims 1, 3) | Plain and ordinary meaning |
| "creating at least a second data miner in response to the customer request for information"<br>('526 Patent, Claim 1) | Plain and ordinary meaning. |
| "second data miner"<br>('526 Patent, Claim 1) | Plain and ordinary meaning |

[4] Here, too, Bright indicated it was "okay" with a "plain and ordinary meaning" construction for this term. Hr'g Tr., Dkt. No. 90 at 73:4–5.

| | |
|---|---|
| "billing the customer for responding to the customer request for information"<br>('526 Patent, Claim 1) | "billing the customer, other than billing only by subscription, not by query, for responding to the customer request for information" |
| "entity"<br>('526 Patent, Claims 6, 16) | "something about which information or data can be stored in a database" |
| "source file"<br>('667 Patent, Claims 1, 4) | Plain and ordinary meaning |
| "parsing selected data elements in the source file into a list of data elements"<br>('667 Patent, Claim 1) | Plain and ordinary meaning. |
| "source location(s)"<br>('667 Patent, Claim 1) | "location(s) of data elements in the source file" |
| "identifying source locations of the selected at least one of the data elements"<br>('667 Patent, Claim 1) | "identifying the locations in the source file of the selected data elements" |
| "target location"<br>('667 Patent, Claim 1) | Plain and ordinary meaning |
| "location file"<br>('667 Patent, Claim 1) | Plain and ordinary meaning |
| "transferring the selectively parsed new data elements from the saved source locations in the source file to the saved target locations in the target database"<br>('667 Patent, Claim 1) | Plain and ordinary meaning |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings

is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 23rd day of September, 2024.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE